IN THE UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF NEBRASKA

LORI ANN LIPKER,               )
                               )
              Plaintiff,       )          7:14CV5010
                               )
        v.                     )
                               )
CAROLYN W. COLVIN, Acting      )          MEMORANDUM OPINION
Commissioner of the Social     )
Security Administration,       )
                               )
              Defendant.        )
_____)


          This matter is before the Court on the appeal of

plaintiff, Lori Lipker ("Lipker"), of a final decision by the

Acting Commissioner of the Social Security Administration ("SSA")

denying Lipker's application for disability benefits.  The Court

finds that the Administrative Law Judge ("ALJ") did not err and

will affirm the decision of the ALJ.

**PROCEDURAL BACKGROUND**

          On or about September 10, 2008,[1] Lipker filed an

application for disability insurance benefits (Tr. 189; *cf.* Tr.

74).  On March 5, 2009, the application was initially denied (Tr.

74).  On April 27, 2009, Lipker pursued reconsideration (Tr. 91).

On July 17, 2009, the application was again denied (Tr. 76).

_____

          [1]  The Court notes that the record reflects some
administrative inconsistencies of filing dates.  Because the date
of filings are not an issue in this matter, the Court will make
no further note on this issue.

Lipker then requested a hearing in a letter sent on August 11, 2009 (Tr. 81). ALJ McClain dismissed Lipker's application because Lipker failed to appear at that hearing despite two SSA attempts to contact her through mail correspondence from her last known address (Tr. 81-82). Lipker appealed the dismissal (Tr. 85). Because the ALJ did not have evidence that Lipker received her notice of the hearing, and because the ALJ failed to send a follow-up letter to Lipker to inquire why she did not appear, the SSA Appeals Council reversed and remanded the ALJ's dismissal (Tr. 86).

On January 14, 2013, Kansas ALJ Stueve held a video hearing (Tr. 36-73). On January 25, 2013, ALJ Stueve found that Lipker was not under a "disability" as defined in the Social Security Act (the "Act") (Tr. 1, 29). The Appeals Council of the SSA denied Lipker's request for review on March 19, 2014 (Tr. 1). Lipker timely filed this appeal on May 23, 2014 (Filing No. 1, see 42 U.S.C. § 405(g)). The Court now reviews the ALJ Stueve's decision, which stands as the Commissioner's final decision.

## FACTUAL BACKGROUND

Lipker was a forty-two-year-old woman on her alleged onset date, January 31, 2007, and held a high school diploma (Tr. 17, 28). Lipker alleges disability due to "chronic back pain, degenerative chronic back pain in spinal [sic] and lower back,

-2-

dizziness, and bipolar disorder" (Filing No. 1, at 3, ¶ 6)
(*Compare* Filing 1, *with* Tr. 87 ("You said that you are disabled
due to meniscus tear, back problems, [post-traumatic stress
disorder], bipolar disorder, knee problems, pain disorder and
fibromyalgia.").  Despite these inconsistencies, the Court
recites the following from Lipker's medical records.  *See Weikert
v. Sullivan*, 977 F.2d 1249, 1254 (8th Cir. 1992) (citing *Hix v.
Dir. of Office of Workers' Comp. Programs*, 824 F.2d 526, 527 (6th
Cir. 1987)).

      Lipker is not sure when her back pain started, but she
estimated that it began in 1991 when she was working as a
personal attendant (Tr. 361).  In July 2005, Lipker was in a car
collision and she was diagnosed with a lumbar strain (Tr. 344-
47).  In March 2007, Lipker presented to Smith County Family
Practice for treatment of a cat bite on her right index finger
(Tr. 355).  On April 18, 2007, Lipker returned to Smith County
Family Practice and reported lower back pain (Tr. 356).  The
clinical findings revealed that Lipker had some muscle spasm, she
could walk on her toes and heels, she had equal and active
reflexes, her muscle strength was equal bilaterally, and straight
leg raising tests were negative (Tr. 356).

      In 2007 to 2008, Lipker visited other clinics,
complaining of back pain, but the clinical findings revealed

-3-

normal psychological, neurologic, and musculoskeletal findings,
including good eye contact, cooperation, range of joint motion,
muscle strength, reflexes, sensation, gait, and balance (Tr. 361-
62, 366, 368, 370, 372).  On September 9, 2008, Lipker told
Advanced Registered Nurse Practioner ("ARNP") Amanda Bickle ("Dr.
Bickle") that she "blew" out her knee the day before and had pain
when walking (Tr. 385).  Lipker dropped off a handicap placard
form for the provider to sign (Tr. 385).  Lipker subsequently
told Dr. Bickle that Ultram and Ibuprofen medication made her
pain tolerable, and the examinations showed she had a good range
of motion, no laxity, a steady gait, and she could transfer onto
and off the table (Tr. 386).  Lipker was alert, fully oriented,
cooperative, and had good eye contact (Tr. 387).

On January 14, 2009, an agency sent Lipker to Sheryl
Shundoff, Ph.D. ("Dr. Shundoff"), for a consultative mental
examination (Tr. 401-04).  Dr. Shundoff noted that, although
Lipker exhibited grimaces and moaning when moving about, Lipker
had "very little problem or apparent discomfort" when she bent
forward to pick up her cell phone from the floor (Tr. 402).  Dr.
Shundoff reported that Lipker was fully oriented with no evidence
of hallucination, delusion or psychosis; her recent and remote
memory were intact; she could perform basic calculations and make
change; her verbal skills were adequately spontaneous, continual,

-4-

and productive; she had coherent and goal-directed thought processes; her insight was adequate; and her judgment was fair (Tr. 403).

One week later, on January 20, 2009, Lipker told Dr. Bickle that she had depression in the past and stopped taking any medication in September 2007 (Tr. 419). The examination showed Lipker was awake, alert, fully oriented, cooperative, and had good eye contact (Tr. 419). Dr. Bickle gave Lipker samples of Lexapro (Tr. 419).

On March 4, 2009, state agency doctors reviewed Lipker's records. On July 14, 2009, those doctors opined that Lipker could perform light and sedentary exertional work despite her impairments, pain, and obesity (Tr. 444-51, 455).

Pursuant to a law enforcement order, Lipker received inpatient mental health treatment between October 20 and November 17, 2009 (Tr. 458). The physical examination on admission was unremarkable (Tr. 458). The psychiatric examination showed Lipker was agitated; she had pressured speech; impulse control was sexual; thought process was vague and illogical with flight of ideas; she was delusional and obsessive, but denied hallucinations; she was unable to abstract and generalize; and she had limited insight, judgment, attention span, concentration, and fund of knowledge (Tr. 458). Lipker refused treatment, and

-5-

Larned State Hospital ("LSH") obtained a court order for treatment and medication (Tr. 459).  On discharge, LSH staff deemed Lipker able to meet basic needs independently, and she had met all goals, objectives, and treatment plan criteria (Tr. 460).

A January 2010 follow-up mental status examination at High Plains Mental Health Center ("High Plains") revealed that Lipker was appropriately dressed and groomed, she had an average intellectual assessment, her affect was appropriate, she was cooperative and fully oriented, and there was no evidence of memory impairment (Tr. 502-03).  Lipker reported that she did not need medications to control her mood (Tr. 503).  Lipker said that she did not need treatment and only participated at LSH because a foster care agency took her daughter from her (Tr. 512).  The staff at High Plains closed Lipker's case and did not schedule any further treatment (Tr. 512).

On March 25, 2011, an examination at Montrose Memorial Hospital showed Lipker had an unstated degree of limitation of back motion, no limitations in her range of joint motion, no motor or sensory deficits, and no edema (Tr. 497).  The remaining examinations between February 24, 2012, and October 31, 2012, continued to limited restrictions, if any.  On February 24, 2012, Lipker was in no acute distress; her extremities had no clubbing, cyanosis, or edema; she had a normal range of motion in all upper

-6-

and lower joints; her deep tendon reflexes were normal; and she had intact motor and sensory examination in her upper and lower extremities (Tr. 631). Two weeks later, a doctor at First Care Clinic signed Lipker's application for a handicap placard (Tr. 644). On March 15, 2012, Lipker had another examination in which she was well-developed, in no acute distress, fully oriented, and answering questions appropriately (Tr. 622-24). On March 27, 2012, APRN Lisa Whitton ("Dr. Whitton") completed a certification that stated Lipker was medically fit to obtain a two-year commercial driver's license (Tr. 645-48). On April 25, 2012, another examination showed Lipker was alert and oriented, her extremities had no edema, and she had no sensory or motor deficits (Tr. 572). In May 2012, Lipker had an allergic reaction to potato chips, and the examination showed she was interacting well and appropriately, her back had no CVA or other tenderness, and she was intact neurologically (Tr. 567-68). On May 22, 2012, Lipker had normal neurological and musculoskeletal examinations. Lipker was also alert, oriented, and answered questions appropriately (Tr. 619). On October 31, 2012, Lipker had another examination which showed she was alert, fully oriented, in no acute distress, very pleasant, talking and laughing (Tr. 605). Lipker had normal extremities with no tenderness, and she had no motor deficits (Tr. 605).

-7-

## ADMINISTRATIVE HEARING

On January 14, 2013, ALJ Stueve held a hearing (Tr. 38-73).  Lipker testified she was last employed in 2010 (Tr. 43-44).  The ALJ determined that Lipker's previous 10 years of work experience in a bakery was substantial, gainful employment (Tr. 44).  The ALJ considered Lipker's in-home, resident-care work relevant (Tr. 45).

The ALJ then focused on Lipker's alleged physical impairments (Tr. 46).  Lipker attributed her disability to "everything" (*Id.*).  She complained of back pain, a hole in her digestive system caused from pain-killers, degenerative disc "stuff," sciatica, depression, post-traumatic stress disorder, "lung issue," arthritis, fibromyalgia, seasonal reflexive disorder, allergies, carpel tunnel, hypoglycemia, and anger issues (Tr. 46-47, 50-59, 61, 72).  Lipker took a variety of medication for her ailments.

The ALJ then asked Lipker about her typical day (Tr. 52).  Lipker does not sleep more than four hours because she needed to take her pain medication.  Lipker wakes at noon, uses the restroom, and then returns to sleep.  Lipker wakes again at five, smokes a couple of cigarettes, and then returns to sleep.  Lipker's only hobby is watching television (Tr. 53).  Previously, Lipker enjoyed walking to the library and playing computer games,

but at the time of the ALJ hearing, Lipker stopped going to the library because she "just don't want to." (Tr. 53).  Lipker's pain is a two on the ten-point pain scale when she wakes (Tr. 59).

Next, Lipker's counsel, James Schneider ("Schneider"), examined Lipker.  Lipker remained 16 hours a day in a recliner (Tr. 54-55).  Lipker testified that she could not do housework except to let the dogs out (Tr. 56).  She could also clean a single plate in the kitchen sink (Tr. 50).  According to Lipker, she could not stand for long, not lift much, and could not kneel without assistance (Tr. 50-51, 58-59).  Lipker could operate an automobile (Tr. 59).

In March 2013, Lipker passed a Department of Transportation physical in order to drive a truck (Tr. 61-62).  Though none of her purported ailments prevented her from acquiring the license, Lipker alleged a doctor took the license away from her due to Lipker's hypoglycemia.  No evidence showed that the doctor rescinded the license (Tr. 62).  In 2009, Lipker had one psychiatric in-patient visit but had not returned since that time (Tr. 62).

Next, Lipker's father, Keith Kostman ("Kostman") testified to the ALJ and Schneider.  Kostman testified that constant pain prohibited his daughter from working (Tr. 64).

-9-

Kostman lives with Lipker, and, though he is on disability, he performed the house chores around the trailer (Tr. 64-65). Kostman collaborated much of his daughter's testimony.

The ALJ then examined the Vocational Expert ("VE"). First, the ALJ asked the VE to classify Lipker's past work.  The VE described Lipker's work as a companion[2] (Tr. 69).  Companion work is classified as light, semi-skilled (SVP 3) work (*Id.*).

Second, the ALJ asked whether the following hypothetical person with several limitations could perform Lipker's previous employment:

> an individual who can perform a range of light work, lifting up to 20 pounds occasionally, lifting or carrying 10 pounds frequently. Standing or walking for six hours and sitting for up to six hours per eight hour day with normal breaks. Occasionally climbing ramps, stairs, ladders, ropes and scaffolds.  Occasionally balancing, stooping, kneeling, crouching, and crawling.  Avoiding exposure to extreme cold, to vibration, and to pulmonary irritants such as fumes, odors, dusts, and gasses.  With work limited to simple, routine, repetitive tasks involving only simple work related decision, with few if any work place changes, and no interaction with the public

---

[2]  Dictionary of Occupational Titles code ("DOT §") 309.677-010.

(Tr. 70).  The VE answered Lipker could not perform work as a companion (*Id.*).  The ALJ asked if there was any positions which the same hypothetical person with Lipker's age, education, and work experience could perform in the regional or national economy (Tr. 71).  The VE answered such a person could perform light, unskilled work, such as a collator operator,[3] patching machine operator,[4] and a garment sorter[5] (*Id.*).

Third, the ALJ asked the VE what positions were available for the same hypothetical person with the same limitations but with the following additional limitation: absenteeism more than two times per month (*Id.*).  The VE answered that such a person could not perform any competitive employment (*Id.*).

In a closing statement to the ALJ, Lipker asserted that her complete lack of teeth precluded employers from considering her for work.

### THE ALJ'S FINDINGS

The ALJ found Lipker last met the Act's insured status requirements on December 31, 2012 (Tr. 17).  The ALJ found Lipker

---

[3]   DOT § 653.687-010.  800 Nebraska ("NE") jobs; 145,000 national ("U.S.") jobs.

[4]   DOT § 361.685-122.  100 NE jobs; 34,400 U.S. jobs.

[5]   DOT § 222.687-014.  150 NE jobs; 27,500 U.S. jobs.

-11-

had not engaged in substantial gainful employment since January 31, 2007, through her date last insured ("DLI") (*Id.*).  The ALJ concluded Lipker had the following severe impairments:  lumbar degenerative disc disease, obesity, bipolar disorder, and allergic rhinitis (*Id.*).  Regarding Lipker's other alleged ailments, the ALJ made the following determinations:

> The claimant has alleged a number of somatic complaints; however, the record fails to support many of her allegations.  First, regarding the claimant's "knee problems," the claimant initially reported that her "knee blew out" in September 2008.  X-rays of the knees were normal.  Similarly, bilateral MRI scans showed asymptomatic bone marrow abnormality, but no evidence of ligament or joint damage.  There was a minor mention of a signal intensity loss of the right medial meniscus, but no evident tear is noted.  Contrary to the claimant's assertion that surgery was offered, no such record exists.  Instead, the record documents that surgery was contraindicated but that the claimant denied conservative treatment such as pain management and injections.  A detailed examination in October 2008 revealed good range of motion in the knees bilaterally with no evidence of laxity and a steady gait.  There are no other references in the record to a diagnosis of a meniscus tear or any other deformity of the knees.  The claimant has not sought any other treatment for this alleged malady.

-12-

As such, I find that this
impairment is not severe under the
regulations in that it does not
result in significant work related
limitations.

The claimant testified that she has
posttraumatic stress disorder
(PTSD).  The only notation of this
diagnosis in the record is in
January 2009, when Sheryl Shundoff,
Ph.D., noted that the claimant
reported having PTSD from a history
of abuse.  Dr. Shundoff diagnosed
the claimant with PTSD by history.
However, there was no evidence of
hypervigilance, exaggerated startle
response, delusions, hallucinations
or other indicia of PTSD.  I note
that no other source has diagnosed
the claimant with PTSD or any other
anxiety disorder for that matter.
Accordingly, based on the lack of a
solid diagnosis and no evidence of
signs or symptoms of this
condition, I find that the
claimant's alleged PTSD is not
severe under the regulations.
However, I note that, because the
claimant's bipolar disorder is
severe, I have performed both a
paragraph B analysis and a mental
residual functional capacity for
the claimant's mental impairments.

Next, regarding the claimant's
fibromyalgia, I note that the
record is void of any diagnosis of
this condition.  I note that the
hallmark diagnostic finding for
fibromyalgia is the existence of 11
out of 18 positive trigger or
tender points throughout the body.
In this case, there are no trigger
point examinations.  The claimant

-13-

has not been seen or treated by a
rheumatologist.  In summary, there
is no evidence that the claimant's
alleged fibromyalgia is even a
medically determinable impairment.

Similarly, the claimant reported on
her appeals that she had vertigo
and labyrinth dysfunction.  I find
limited evidence of such a
diagnosis or any treatment for
related symptoms in the record.  In
August 2009, Amanda Bickle, APRN,
entered an "encounter" note with an
assessment of vertigo, memory
lapses or loss.  However, this
record is deficient to establish a
medically determinable impairment
for several reasons.  First, there
is no data regarding the claimant's
symptoms or complaints.  Secondly,
this record does not contain any
clinical signs and findings.
Finally, Nurse Bickle is not an
acceptable medical source under the
regulations, thus, her assessment
is insufficient to establish a
medically determinable impairment.
Specifically, the regulations
require that there must be evidence
from an acceptable medical source
in order to establish the existence
of a medically determinable
impairment.  I find that the
claimant's alleged vertigo and
balance problems are not medically
determinable.

Likewise, the claimant alleged that
she suffered a transient ischemic
attack in July 2009.  In other
records, she reported she had a
full-blown stroke.  However, the
record does not contain any medical

-14-

documentation to establish either
diagnosis.  The claimant has not
been followed by a cardiologist or
treated emergently for symptoms of
a stroke or TIA.  This alleged
impairment is also not a medically
determinable impairment under the
regulations.

Regarding the claimant's alleged
headaches; the claimant has
reported headaches to her treating
nurse practitioners.  However, an
MRI of the brain, dated March 30,
2012, was unremarkable.  Although
the claimant is a habitual visitor
to the emergency room, she has not
presented to the hospital with
signs or symptoms of acute
migraines or headaches.  As such, I
find that the claimant's alleged
headaches do not result in
significant work related
limitations and are therefore not
severe.

Finally, the claimant has also
alleged that she has pinched nerves
and arthritis in her hands.  In
August 2007, the claimant reported
pain in her hands, but the physical
examination was entirely
unremarkable.  The claimant was
diagnosed with osteoarthritis.  She
returned in September 2007 with
similar complaints.  Again, there
was no evidence of joint swelling,
erythema, or joint instability,
although there was a notation of
tenderness to palpation.  The
claimant declined Celebrex for
joint pain and she was advised to
treat her pain with over-the-
counter remedies.  There are no
objective tests of the hands

-15-

> showing deformity or confirming the
> diagnosis of osteoarthritis.
> Additionally, there is no testing
> to determine the degree of
> arthritic change, if any, in the
> claimant's hands.  Although she
> testified that she cannot use her
> hands due to the pain and
> limitation in her joints, her
> father testified that she is able
> to do her half of the chores around
> the house.  Based on all of the
> evidence, I find that the
> claimant's osteoarthritis of the
> hands is not severe in that there
> is no substantial evidence that
> this impairment results in
> significant work related
> limitations.
>
> I find that any other impairment
> not alleged by the claimant but
> mentioned in the medical records is
> not severe under the Act and
> Regulations because it has no more
> than a minimal effect on the
> claimant's ability to perform basic
> work activities or it has not
> persisted for a continuous period
> of at least twelve months.

(Tr. 18-19).

The ALJ concluded that Lipker did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 19).  The ALJ went on to ascribe Lipker's Residual Functional Capacity ("RFC") (Tr. 21).  The ALJ determined that Lipker could perform the following tasks:

-16-

> light work as defined in 20 C.F.R.
> 404.1567(b) in that she may
> occasionally lift 20 pounds and
> frequently lift 10 pounds.  The
> claimant is able to sit for up to 6
> hours and stand or walk for
> approximately 6 hours in 8-hour day
> with normal breaks.  Furthermore,
> the claimant retains the ability to
> occasionally climb ramps, stairs,
> ladders, ropes and scaffolds.  She
> can occasionally balance, stoop,
> kneel, crouch, and crawl.
> Additionally, she should avoid
> exposure to extreme cold and
> vibration as well as to pulmonary
> irritants such as fumes, odors,
> dusts, and gases.  The claimant can
> perform work limited to simple,
> routine, and repetitive tasks;
> involving only simple, work-related
> decisions; with few, if any, work
> place changes.  However, she is
> unable to perform jobs that require
> interaction with the public.

(Tr. 21).  Consequently, the ALJ found Lipker was not disabled as defined in the Act (Tr. 29).

## STANDARD OF REVIEW

In reviewing a decision to deny disability benefits, the district court's role under 42 U.S.C. § 405(g) is limited to determining whether substantial evidence in the record as a whole supports the Commissioner's decision.  *Harris v. Shalala*, 45 F.3d 1190, 1193 (8th Cir. 1995).  "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." *Juszczyk v. Astrue*, 542 F.3d

-17-

626, 631 (8th Cir. 2008).  If it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, we must affirm the denial of benefits.  *Id.* (quotations and citations omitted). Thus, the Court will uphold the Commissioner's final decision "if it is supported by substantial evidence on the record as a whole."  *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008).  The Court should only disturb the ALJ's decision if the decision falls outside the available "zone of choice;" a decision is not outside that "zone of choice" simply because the court may have reached a different conclusion had the court been the fact finder in the first instance.  *Buckner v. Astrue*, 646 F.3d 549, 556 (8th Cir. 2011).

**LAW & ANALYSIS**

In her brief, Lipker asserts three errors to the ALJ's decision:  the ALJ erred when he failed to consider medical evidence when assessing Lipker's RFC, the ALJ erred when he failed to discuss "specific" limitations regarding Lipker's obesity, and the ALJ erred when he failed to discuss the global assessment of functioning ("GAF").

First, Lipker objects to the ALJ's RFC analysis.  In Lipker's brief, she cited *Lauer v. Apfel*, 245 F.3d 700 (8th Cir.

-18-

2001).  The Eighth Circuit Court of Appeals explained the *Lauer*

decision in a later precedent:

> In *Lauer*, the only doctor who had
> opined that the claimant could work
> was a consulting physician who did
> not examine the claimant, did not
> view all the medical records, did
> not provide an explanation for his
> conclusion, and did not diagnose
> the claimant with the same mental
> impairments that the ALJ concluded
> were established by the medical
> evidence.  *Lauer*, 245 F.3d at 705.
> We concluded that the ALJ erred in
> determining the claimant's residual
> functional capacity without relying
> on reliable medical evidence and
> the aid of a professional.  *Id.* at
> 706.

*Krogmeier v. Barnhart*, 294 F.3d 1019, 1024 (8th Cir. 2002).  The

ALJ in Lipker's case is clearly distinguishable because the ALJ

exhaustively relied upon medical evidence in forming his opinion

and the ALJ did not rely upon a physician whose opinion

contradicted evidence and other opinions.

Also, an ALJ's RFC is not based only one physician's

opinion; he bases it on the record as a whole.  *Cox v. Astrue*,

495 F.3d 614, 619 (8th Cir. 2007).  The ALJ considered various

sources of evidence.  The ALJ considered that Lipker worked after

her alleged disability onset date, though her earnings were not

at the substantial gainful activity level (Tr. 17).  The ALJ

considered objective and subjective evidence of all the alleged

-19-

conditions, with specific reference to the record to demonstrate
how these conditions did not satisfy the requirements for an
award of disability benefits (Tr. 18-19, 22-25; 356, 361-62, 366,
368, 370, 372, 386-87, 403, 419, 497, 502-03, 567-68, 572, 605,
618-19, 622-24, 631).  The ALJ examined Lipker's mental
impairments compared to her admitted activities and abilities
(Tr. 20, 25-27).  The ALJ's RFC reflects those considerations
(Tr. 21).  The Court finds the ALJ did not err in his
consideration of Lipker's RFC and that the substantial evidence
in the record as a whole supports the ALJ's decision.

        Second, specificity of the ALJ findings on Lipker's
obesity are not in question.  As Lipker correctly cites, the
Eighth Circuit has held that "substantial evidence did not
support the denial of benefits based on a finding that the
claimant could return to his past relevant work, because the ALJ
failed to make the required specific findings at to the
claimant's residual functional capacity and past work demands."
Filing No. 21, at 6 (citing Social Security Issues Annotated at
page II-51, 105.7).  However, the ALJ here did not find that
Lipker could perform her past relevant work.  Therefore, the
argument is moot and out of place.  Also, the ALJ here stated he
considered the effects of Lipker's obesity pursuant to Social
Security Ruling ("SSR") 02-01p when he determined her RFC (Tr.

18), and this Court may not assume otherwise. *Wildman v. Astrue*, 596 F.3d 959, 966 (8th Cir. 2010); *Hamilton v. Sec'y of Health & Human Servs.*, 961 F.2d 1495, 1498-99 (10th Cir. 1992); *Wall v. Astrue*, 561 F.3d 1048, 1070 (10th Cir. 2009).

Third, Lipker asserts reversible error based upon the ALJ's failure to discuss Lipker's GAF.  The Eighth Circuit has recognized that the GAF score is a subjective determination that may have little or no bearing on the claimant's social or occupational functioning.  In *Jones v. Astrue*, the Eighth Circuit stated "we are not aware of any statutory, regulatory, or other authority requiring the ALJ to put stock in a [GAF] score. . . . Moreover, the Commissioner 'has declined to endorse the [GAF score]'." *Jones v. Astrue*, 619 F.3d 963, 973 (8th Cir. 2010). The Court finds no error in the ALJ's actions regarding Lipker's GAF score.

**CONCLUSION**

Substantial evidence in the record as a whole supports the ALJ's findings.  The Commissioner's denial of plaintiff's benefits claim will be affirmed.  A separate order will be entered in accordance with this memorandum opinion.

DATED this 18th day of May, 2015.

BY THE COURT:

/s/ Lyle E. Strom

_____
LYLE E. STROM, Senior Judge
United States District Court